Filed 8/25/21  In re N.V. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re N.V., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. MICHELLE V., Defendant and Appellant. | G060005 (Super. Ct. No. 20DP0389) O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Robert J. Gerard, Judge.  Affirmed.

Marisal L. D. Conroy, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Deborah B. Morse, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

\*          \*          \*

Michelle V. (the mother) appeals the disposition order determining the child, N.V., would be at substantial danger if returned to her care and must be placed with D.T. (the father), to serve his best interests. She contends substantial evidence did not support the disposition order and/or there were reasonable alternatives to removing N.V. from her home, and the juvenile court therefore abused its discretion by awarding the father sole custody. She also contends the court inappropriately delegated control over visitation to the child and conjoint therapy to the child's therapist.

We disagree. The evidence was more than substantial that the mother remained defiant, defending the decisions that led to dependency, and had not availed herself of adequate services, particularly therapy. As a result, there were no reasonable alternatives to removal. Further, the disposition order was proper and the court did not impermissibly delegate issues relating to visitation or conjoint therapy. We therefore affirm the orders.

I

FACTS

Because of the lengthy record in this case, we have summarized the facts as succinctly as possible. Additional facts, where necessary, will be added in the Discussion section of this opinion.

*Detention*

As of February 2020, the mother and N.V. were living in California, while the father resided in New York. The father had not seen N.V. in more than two years. According to the mother, N.V. had been diagnosed with attention deficit hyperactivity disorder (ADHD) and posttraumatic stress disorder (PTSD). She claimed there was a

2

history of physical abuse by the father and sexual abuse by a cousin, the father's nephew. New York authorities later stated these allegations had been investigated and deemed unfounded.

On or about February 17, N.V., who was seven years old at the time, "was hospitalized for a tonic-clonic seizure." N.V. had no history of seizures, but the mother reported N.V. had fallen the previous week. The child had been prescribed Wellbutrin and Seroquel.[1]

The Orange County Social Services Agency (SSA) received a report from the hospital that while the child was hospitalized, the mother gave him a dose of her own Seroquel prescription, despite being aware that all medication was to be administered by hospital staff. She said the medication was needed as the child was out of control, behavior not witnessed by hospital staff.

SSA also received a report that N.V. had not been to school in several weeks, and it was later revealed he had only been to school for five days that year. The mother had exhibited symptoms of mental health issues, including rapid speech and grandiose statements.

During an interview with SSA, a strong odor of marijuana was noted in the mother's home. She told the social worker she used marijuana for PTSD and back pain, and denied smoking in the presence of the child. She was oriented and coherent at the beginning of the interview, but she deteriorated and began ranting about her problems with the father. She was unable to answer questions, and had difficulty focusing on anything except her difficulties with the father and her own parents. She denied mental illness.

---

[1] Seroquel and Wellbutrin are both mood-altering drugs.

With regard to the incident at the hospital, the mother stated that she immediately took N.V. off the Wellbutrin and Seroquel once she learned they could cause seizures. She denied giving him her own prescription and stated the hospital staff were lying.

SSA was unable to meaningfully interview N.V., as he seemed annoyed and was uncooperative. It appeared he had been coached, and he answered every question "I don't know."

In a subsequent phone call with SSA initiated by the mother, she changed her story with respect to what had happened in the hospital. She claimed that when the nurse did not arrive to give N.V. his dose of Seroquel, she gave it to him from his prescription bottle, claiming that he was "'extremely aggressive.'"

N.V. had an individualized education plan (IEP) that stated he had been diagnosed as emotionally disturbed with ADHD. He presented as very aligned with the mother, was disruptive at school, and told staff he would get them fired. He had made false accusations and had acted out sexually, asking another male student if he could touch his private parts. According to the school employee, the mother presented as paranoid, despite her legitimate concerns about her son's health.

The father was reached in New York and was cooperative with SSA. He told the social worker he had not seen N.V. in two and a half years, describing the mother as "'a complete psychopath.'" He said he had allowed N.V. to move with her to California because his "'family couldn't handle her and the way she was treating them and me.'" Her allegations about his nephew molesting N.V., he said, had been investigated by social services in New York and were determined to be unfounded. She had also filed over 30 police reports against the father. The father denied that he or his girlfriend had ever hit N.V. The mother had not updated him as to her whereabouts or

4

complied with the family court visitation order. According to the father, N.V. had not been on any medications when he was younger.

The father told SSA the mother "'has taken away my whole life and my son. I have spent seven years going through Family Law Court. . . . I wanted to have a psychiatric evaluation done but ran out of money. I want full custody of [N.V]. I know something is wrong and I think about him all day long.' He said that the mother uses [N.V.] 'as a weapon.'"

On March 25,[2] the social worker received a call from N.V.'s school. During a video conference with the mother, she had informed the school that N.V. was acting out so she was allowing him only bread and water to eat. When his behavior improved, he could earn other foods. She was told this was inappropriate. The mother also stated she had been putting the child in a closet and holding the door shut when he acted out. She confirmed he had been taken off all of his medications without medical advice.

During this meeting, the mother vacillated between crying out for help and stating she just wanted to be left alone. She presented with grandiose ideas and stated she wanted to use holistic treatment such as cannabidiol oil instead of medication. The school psychologist, who was present during this meeting, described her as "unraveling."

A protective custody order was granted the same day. The social worker, accompanied by law enforcement, went to the mother's home to serve the warrant. She refused to open the door, yelling that she did not have "'food and water'" for the child, but declined offers of help. Law enforcement eventually entered through an unlocked door, finding the home in "complete disarray," with a strong odor of marijuana present.

---

[2] By this date, COVID-19 precautions and closures had altered daily life, including the manner in which schools, SSA, and the court conducted business.

Eventually, she allowed the child to be detained. The child yelled at the social workers and defended her.

The mother's behavior escalated thereafter. She sent the social worker and her supervisor incoherent messages alleging human rights violations and that her child had been kidnapped and was being held as a prisoner. She said she would "tak[e] . . . down" SSA.

On March 27, SSA filed a petition pursuant to Welfare and Institutions Code, section 300, subdivisions (b)(1), (c), and (g)[3] alleging failure to protect due to the parent's mental illness, serious emotional damage, and no provision for support.

The detention hearing was held on March 30. The father traveled from New York to be present. The court found a prima facie case, ordered the child detained under section 300, and released the child to the father in New York with various protective orders, including monitored electronic and in-person visits for the mother.

*Jurisdiction Reports*

The father returned to New York with N.V. and began efforts to help him adjust, but the mother's behavior continued to escalate. She contacted New York Children and Family Services (NYCFS) and reported the father had "kidnap[ped]" the child. NYCFS, for its part, found six to seven substantiated allegations against her. She refused to engage by telephone with social workers (in the middle of the pandemic) because SSA's policy did not allow such calls to be recorded. Therefore, she did not participate in the family assessment or in developing the case plan. SSA sent her referrals for services by mail.

_____

[3] Subsequent statutory references are to the Welfare and Institutions Code unless otherwise indicated.

A meeting with N.V. and the social worker indicated he was strongly aligned with the mother. He told the social worker his father hit him really hard and gave him black and blue bruises and that his father's fiancé slapped him in the face. He could not recall when either of these events occurred.

Video conference visits between N.V. and the mother began. Sometimes these went well, on other occasions N.V. exhibited problematic behaviors. At times, the mother would become upset with the visitation monitor and behave irrationally. During one visit, she told the monitor she must let her have more time or "'incur wrath.'" The monitor attempted to redirect her, but she began shouting to N.V. and told him to "'run because they are going to get him'" and "'they are not on your side.'" She also screamed that "'aliens are here to get you.'" The father reported N.V. had a tantrum after that call and that he regressed after each video call.

During the next call, which began well, N.V. asked the mother when he could return home. The monitor attempted to redirect him, but she began yelling to N.V., telling him not to listen to them. She continued this conduct despite a warning from the monitor, and the call was terminated. The father reported that N.V. was extremely upset. Thereafter, visitation was terminated on several occasions when she became combative and would not cooperate with the visitation monitor. N.V. demonstrated less of a desire to visit with his mother over time, outright refusing on multiple occasions. N.V. also expressed anger and confusion to his father as to why she was often untruthful.

As part of the ongoing investigation and assessment, SSA spoke to the maternal grandmother and step-grandfather. Professionally, they were a psychiatric nurse and licensed clinical social worker, respectively. The maternal grandmother reported the mother had a history of mental illness and drug use, and was emotionally unstable, dating

7

back to her teenage years. She had been hospitalized numerous times due to self-harm and suicidal ideation. Both believed she needed long-term psychiatric treatment.

The father scheduled care and assessments for N.V. as permitted by the COVID-19 pandemic. N.V. was enrolled in an online school. He had been diagnosed with ADHD and placed on medication, but not the drugs the mother had given him. His behavioral issues were being addressed with in-home services. N.V. reported to the social worker that things are "going good" at his father's home, although he missed his mother and wanted to return to her care. He was still talking to her "on the phone but not as much." He felt safe at the father's home. He told the social worker that his mother sometimes locked him in the closet and only fed him bread and water as punishment.

Moreover, N.V., while in his father's care, began making disclosures the father recorded for the court. In one recording, he told the father's fiancé that the mother encouraged him to smoke marijuana to help him "feel better" when he had "mental problems." The child believed marijuana was good for him. He asked the social worker to ask the mother to send him a new "'glass tube [with] a hole on the side where you could smoke out of it' and the other side you 'put a green ball made of plant, a type of medicine.'" "The child was consistent in his statements about the mother allowing him to smoke out of [such] devices." The mother provided no response when N.V. told her he had reported these matters to the father's fiancé and the social worker. An SSA investigation found these allegations, as well as others relating to edible marijuana, substantiated.

N.V. also reported to the father and his fiancé that he believed he had "mental problems" that led him to be "dangerous with my mom. And she actually has to lock me in the closet . . . ."

8

According to N.V.'s therapist, he was "'starting to realize things are very different from when he was living with his mother. He is happy in New York. I do not think he can share that with his mother. He knows his mother wants him back. . . . Ultimately, he wants to know why all this happened.'" He had expressed that he felt he was removed because of his own bad behavior. Conjoint sessions with the mother were not recommended at that time.

As of June 2020, the father shared that N.V. was slowly adjusting and opening up to everyone. He stated getting the child ready for visits with the mother was a challenge. N.V. had shown improvement since he had started ADHD medication.

SSA's recommendation to the court was to sustain the petition and terminate proceedings with exit orders. The mother's participation in the case plan, other than visits, was nonexistent. SSA stated it appeared she had unresolved mental health issues, and throughout the proceedings had demonstrated concerning behavior as reported by multiple professionals. She made worrisome statements to N.V. during visits, and refused to cooperate with SSA if she could not record the conversations. She had demonstrated "high volatility behaviors and has made several accusations against [SSA]."

*Jurisdiction Hearing*

The hearing began on August 26. SSA reports were received into evidence, and the social worker testified consistently with the reports. On the next court date, the parents pled no contest to an interlineated petition that dropped all but the failure to protect allegation as grounds for dependency. The court ordered an Evidence Code section 730 evaluation for the mother. The court also ordered weekly electronic visits between her and N.V. "to include the child's input." SSA was granted authority to

9

liberalize visitation if the child requested more visits with her. SSA was also to refer the mother and child for conjoint counseling with a neutral therapist in consultation with both of their current therapists. A contested disposition hearing was set and eventually continued to February 10, 2021.

*Disposition Reports*

SSA prepared numerous reports between the jurisdiction and disposition hearings. In September, the mother informed SSA that she was going to New York to stay with a friend, as she wanted to have in-person visits with N.V. N.V. began refusing calls with her regularly. The father and SSA attempted to intervene to encourage N.V. to participate. SSA arranged the ordered services for her and attempted to find a conjoint therapist.

The mother had begun seeing a private therapist in May with the goals of "'Managing symptoms of trauma, increasing self-esteem, and to stay calm so she can communicate more clearly and effectively especially when she is feeling stressed.'" Her only mental health diagnosis, according to her therapist, was PTSD. The therapist's communications with SSA indicated a strong alignment with the mother, and the therapist did not accept anyone else as a reliable source of information. The court, upon learning this, was deeply concerned, but the mother refused to seek a new therapist.

An in-person visit at a visitation center was arranged. The father opposed this facility for safety-related reasons. The court later gave SSA discretion as to the location of visits.

The father reported the child was doing well and continued to attend therapy. A local social worker reported the home was clean, organized, and safe.

10

N.V. told the social worker that he was "'good'" and school was going well. His teacher described him as an "'excellent student'" in his specialized classroom. He was "'amazing'" and had no troublesome behaviors. His therapist reported "significant progress" and that he was becoming "'a completely different child.'"

The mother began engaging in services, completing an anger management class, a parenting program, and substance abuse services. An evaluation indicated she did not meet the criteria for a substance abuse diagnosis.

The Evidence Code section 730 evaluation was completed. The examiner opined that the mother did not appear to be maliciously harming the child, but acted to meet her own needs without understanding the consequences on the child. She was overwhelmed by caring for N.V. and took matters into her own hands. It was of concern that she administered marijuana to N.V., given the mind-altering effects and the potential for deleterious impact on a developing brain. She needed to learn coping mechanisms and strategies, and without change on her part, the potential for repeated behavior patterns existed. The examiner did not believe she suffered from bipolar disorder, but testing indicated a possible diagnosis of borderline personality disorder. The examiner recommended a treatment course of 18 months to two years and conjoint therapy when the child was ready. "Especially useful will be behavioral and interpersonal interventions that directly address her impulsive and socially overwhelming actions."

The examiner further stated: "[T]his woman's immediate experience of being subjected to questioning of a personal nature is likely to draw out well-seasoned defenses. This woman may use her considerable appeal and charisma to effectively smooth over even the most direct accusations of problem creation. This is a well-oiled defense that catches even experienced therapists off guard and, where possible, should be managed by noting it as it occurs and exploring it nonjudgmentally in its immediate

11

context.  A firm but empathic response is essential to understanding how this woman uses these defenses in other personal or professional situations."

*Disposition Hearing*

The disposition hearing was held in February 2021.  The mother called the social worker, who testified over multiple days in a matter largely consistent with SSA's reports.  The social worker was also asked about the family's history dating back to the parents' divorce, the mother's move to California and subsequent disappearance, and the sexual abuse allegations against the cousin which were deemed unfounded by NYCFS.  The social worker also discussed her concerns about the mother's therapist, including her apparent inability to understand the court's involvement, defensiveness about the mother, and unwillingness to accept the facts set forth in the petition.  Accordingly, the mother's therapy progress could not be evaluated adequately.

Conjoint therapy had not yet begun because N.V. had stated he was not ready.  He wanted to remain in the father's care.  The social worker discussed attempts to encourage N.V. to participate in video visits, and persistent concerns that if given the opportunity, the mother would abscond with N.V. or provide him marijuana during in-person visits.  The social worker did not recommend a joint legal custody order due to her history of making educational decisions against the recommendations of N.V.'s school, and acting in contravention of medical advice with respect to medical decisions.

The mother also testified, claiming she provided N.V. with appropriate care when he was in her custody.  She denied not following expert recommendations, and attributed her problems to side effects from past medications, the father, SSA, and NYCFS.  She denied not allowing the father access to the child, believed without evidence the father was a "diagnosed sociopath," and claimed that N.V. was not safe in

12

the father's care. She blamed the father for alleged parental alienation, and claimed SSA had not offered her services.

The mother admitted that past "mistakes . . . were made." She "could have handled things better. I did the best that I could." Her mistakes, such as administering Seroquel to N.V. in the hospital, were attributable to her own trauma. She said other issues were mischaracterized or misunderstood. She admitted giving N.V. marijuana, claiming she had consulted with a psychiatrist and his pediatrician first. She did not think it was a poor decision.

The mother testified she currently had appropriate coping mechanisms. She vowed only to use appropriate discipline in the future, but continued to state everything she had done in the past, including providing marijuana to a seven-year-old, had been under the advice of professionals.

The father testified that prior to the dependency case, he had not seen N.V. since December 2017. Currently, N.V. was seeing a psychiatrist, psychologist, and was attending school. N.V. had successfully completed a behavioral program and had seen a pediatrician and a dentist for checkups. The father testified N.V.'s progress was "absolutely fantastic" and he had begun to perform at grade level. While he currently had an IEP, he was "doing excellent," and was transitioning to a more general education setting. He had addressed parenting in his own counseling and had discussed relevant issues with N.V.'s therapist as well. They were trying to reach the point where N.V. would be ready for conjoint counseling with the mother, but the child had told the father he was not ready. He did the best he could to facilitate video visits, making N.V. available "every single time." The father encouraged the visits, telling N.V. that the mother missed him and he needed to speak with her. The father would also say that N.V. had this time with her, and he should spend it with her.

13

The father felt joint legal custody was not an option because the mother "would take [him] to court over and over again" until an issue was resolved in her favor.

The court considered argument and reviewed all the evidence and testimony. Based on the "overall picture," coparenting was not a viable option. While the mother might believe the father was not looking out for N.V.'s best interests, the court found "that is simply not the case." N.V. was "thriving under the care of his father. And the improvement in the child's behavior and maturation and ability to deal with his own [ADHD was] marked and notable. . . . [C]ertainly his overall well-being is being very well served in the care of the father." The mother's inability to "recognize . . . how this child is doing under the father's care is of concern to the court."

The court ordered "sole legal and physical custody to the father." Expanded in-person visitation was ordered, to be monitored at the mother's expense. The dependency proceedings were terminated.

The mother now appeals.

II

DISCUSSION

*Judicial Notice*

The mother requests we take judicial notice of a petition she filed on June 25, 2021, in the New York Family Court. The petition alleges the father has denied her the visits the court ordered in its disposition. She claims this is relevant to the issue of whether the court erred by granting the father sole legal custody.

This court may take judicial notice of the records of a court in any state. (Evid. Code, §§ 452, subd. (b), 459, subd. (a).) But we only take judicial notice of the existence of a petition such as the one at issue, not the truth of any matters that are

14

asserted in it.  (*Day v. Sharp* (1975) 50 Cal.App.3d 904, 914; see *Lockley v. Law Office of Cantrell, Green, Pekich, Cruz & McCort* (2001) 91 Cal.App.4th 875, 882.)  Therefore, the only fact we would be judicially noticing is that a petition was filed.

The petition, alone, is not relevant without adjudication of the facts included therein.  Only relevant evidence is subject to judicial notice.  (*Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063, overruled on other grounds in *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1262.)  We do not find the fact that the mother filed a petition regarding visitation in family court, alone, to be relevant to any issue in this case.  Nor do we find this information to be substantially consequential to this case.  (Evid. Code, § 459, subd. (c).)  The request for judicial notice is therefore denied.

*Substantial Evidence*

The mother's first argument is that substantial evidence did not support the dispositional findings, and she further claims that reasonable alternatives to removal from her custody were available.

To support an order of removal, the court must determine whether there is clear and convincing evidence "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody."  (§ 361, subd. (c)(1).)

We review the court's determination that removal was necessary for substantial evidence. "Substantial evidence is evidence that is 'reasonable, credible, and of solid value'; such that a reasonable trier of fact could make such findings."  (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.)  "Issues of fact and credibility are questions

15

for the trial court and not the reviewing court.  The power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the trier of fact." (*In re Christina T.* (1986) 184 Cal.App.3d 630, 638-639.)  "[W]e draw all reasonable inferences in support of the findings, view the record most favorably to the juvenile court's order, and affirm the order even if other evidence supports a contrary conclusion.  [Citation.]  The appellant has the burden of showing the finding or order is not supported by substantial evidence." (*In re Megan S.* (2002) 104 Cal.App.4th 247, 250-251.)  "Although there must be a present risk of harm to the minor, the juvenile court may consider past events to determine whether the child is presently in need of juvenile court protection." (*In re A.F.* (2016) 3 Cal.App.5th 283, 289.)

The mother argues there was no substantial evidence under section 361, subdivision (c)(1), that substantial risk of harm existed and there were no reasonable means for protecting N.V.'s welfare without removal.  In doing so, she focuses entirely on the facts immediately prior to the disposition order, ignoring the history of the case, and presents those facts in the rosiest possible light, disregarding contrary evidence.

The mother claims "[t]here simply was no threat to [N.V.] at the time of the disposition hearing.  There was simply no reason [N.V.] could not be safely returned home."  But this disregards a host of very inconvenient facts.  At the disposition hearing, she testified that giving N.V. marijuana was *not* a poor decision.  She claimed to have consulted unnamed physicians and psychiatrists about giving N.V. marijuana, and testified this occurred after February 18, 2020, which would mean she did so after the incident at the hospital where she gave N.V. her Seroquel prescription.  She provided no medical records to support her testimony that she had consulted anyone about this decision.

16

The Evidence Code section 730 evaluator referred to this as an issue of concern, referring to marijuana as "a mind-altering drug with no guidance on dosage or clear indication of usage." With respect to use in children, the evaluator stated there was a "substantial amount of research" that marijuana has deleterious effects on the brain, which continues to develop even into early adulthood. The mother, the evaluator stated, did not appear to "have been able to think rationally nor make solid well thought out decisions" when it came to her son's well-being. This inability was "of utmost concern and could lead to further abuse if the mother is not able to get the support and guidance she needs." And despite her claims that N.V. would be in no danger in her care, she was still attempting to justify the decision to give him marijuana as late as the disposition hearing.

At the same hearing, the mother testified about her decision to put N.V. in a closet and not allow him to come out. Even while claiming she would not do so in the future, she testified there was nothing wrong with her decision, calling it a "plan" put in place in consultation with yet another unnamed provider. Despite her statements to school personnel, N.V.'s statements, and the findings in the sustained petition, she continued to deny she gave N.V. only bread and water as a disciplinary technique.

While the mother vaguely admitted "mistakes . . . were made" she demonstrated little understanding or personal responsibility about the issues that had led to dependency. She continued to demonize the father, stating that N.V. was at risk in his care, and denying the obvious evidence that he was, in fact, thriving.

The mother also claims there was no "evidence [she] suffered from an unresolved mental health problem" because she had consistently attended therapy. She

17

did not use SSA's referrals for therapy.  Her only treatment was with a therapist[4] she chose herself, and who was clearly and strongly aligned with her.  The therapist's initial stated treatment goals were "'[m]anaging symptoms of trauma, increasing self-esteem, and to stay calm so she can communicate more clearly and effectively especially when she is feeling stressed.'"  These goals did not include any of the matters discussed in the petition.

As of September 2020, the mother's therapist stated she had been treating her weekly since May 18.  She had "attended all of her sessions on time" and "utilized her sessions to process her history of interpersonal trauma and abuse."  The therapist opined she had "made progress in a very short time, and has been observed managing her emotions independently, practicing coping skills, increasing her self-care strategies, and reframing her thinking to be more helpful to her mental health."  None of this "progress" appeared to be related to the issues in the sustained petition.

With respect to the mother's parenting of N.V., the therapist stated: ""[S]he likes to engage with [N.V].  Deeply peaceful, connected and her personal strengths, insightful, honest, and punctual. Considerate and honors commitments to respect boundaries.  She is able to set reasonable expectations and is a committed mother. She is able to find support for her son, has a lot of patience, and tries to find the best solution to the problems.'"  Again, the therapist did not acknowledge any of the issues that had led to dependency.

The court, upon learning the therapist was not accepting the petition's findings, was concerned, but the mother refused to seek a new therapist.  The court

---

[4] The therapist listed her own credentials as an "MA" (presumably a Master of Arts, although it is unclear in what discipline), "LCAT" (licensed creative arts therapist), and "RDT," (registered drama therapist), both of which are nongovernmental certifications. She described herself as a "Creative Arts Therapist."

18

continued to express "tremendous concern," over this issue, noting the therapist was more aligned with the mother's version of events than the court's factual determinations. The court directed SSA to inform the therapist that the mother's treatment goals were "not up for negotiation."

In later communications, the therapist questioned the "right" of the maternal grandmother to be "involved" in the case and stated the NYCFS investigation of the alleged abuse of N.V. by a cousin was "mishandle[ed]." In other communications with SSA, the therapist continued to treat the mother as a trauma victim, seemingly accepting everything she told the therapist without question. The therapist stated "the mother never used discipline that would be considered abusive," and justified the mother's decision to give N.V. marijuana as following a doctor's recommendation.

The therapist was provided with a copy of the sustained petition, but told the social worker that "the mother had shared some discrepancies after the fact" regarding the petition's contents, despite the fact that she had pleaded no contest. The social worker asked the therapist to adjust her treatment goals to facilitate reunification. The therapist responded that she was working on the PTSD the mother had suffered as a result of domestic violence. When the social worker informed the therapist that those allegations had not been corroborated, the therapist responded that she believed the mother. The therapist was again asked to help her deal with the issues that brought her to dependency court in order to facilitate reunification.

As of December 2020, a few months before the disposition hearing, the therapist reported "updated treatment goals," including "[i]mproving her ability to trust healthcare providers," developing a parenting plan that included "age appropriate and evidenced based" discipline, and how "to coparent more effectively" with the father. The mother, as of January 2021, used "her sessions to help her attain her treatment goals."

19

Thus, while it was true that she eventually sought therapy, there was more than substantial evidence from which the court could conclude that the treatment she had received did not adequately address the issues that had led to dependency or demonstrated those issues would not reassert themselves if N.V. was returned to her.

As late as January 20, 2021, weeks before the disposition hearing, the mother filed a motion to withdraw her no contest plea to the amended petition. Her declaration, which made liberal use of hearsay and facts not included in the record, claimed, in part, that she did not understand what she was doing when she pleaded no contest and that she would never give up her right "to clarify a petition that is filled with a number of baseless allegations." This assertion does not support the contention that the issues that led to dependency were resolved, as she was still denying the truth of those issues.

The Evidence Code section 730 evaluator also disagreed with the mother and her therapist that her current treatment was adequate and that she had no outstanding mental health issues. Indeed, the evaluator believed many issues had been unaddressed and she should be "mandated" to undergo an 18-to 24-month course of treatment. She needed to learn coping mechanisms and strategies to ameliorate the potential for repeating the same behavior patterns and "behavioral and interpersonal interventions that directly address her impulsive and socially overwhelming actions." Conjoint therapy to repair her relationship with N.V. should "begin when the child is ready." In contrast to her therapist's stated goals for therapy, the Evidence Code section 730 evaluator stated: "Treatment may be best geared to countering her problematic attitudes, eliminating questionable behavior, reestablishing psychic balance, and strengthening any preexisting socially acceptable coping patterns."

Taken together, the picture the evidence presents is not one of a close case. Indeed, the evidence was overwhelming, based on the mother's past conduct, her inadequate treatment, and the court-appointed evaluator's recommendations, that N.V. would be in immediate and persistent danger if he were returned to her custody. She had not addressed the issues that led to dependency and had taken no steps to prevent recurrence of that behavior.

As to the second requirement, alternatives to removal, for largely the same reasons, there was more than substantial evidence that removing N.V. from the mother's care was the only reasonable alternative. She suggests that "'stringent conditions of supervision'" or in-home services would have been sufficient. The facts and history of this case simply do not support this conclusion.

Further, the cases cited by the mother on this point are inapposite. In *In re Henry V.* (2004) 119 Cal.App.4th 522, 527-530, for example, the removal was based on a single occurrence of abuse, the mother was "'forthcoming'" and "'extremely cooperative'" and there were reasonable means to avoid removal to foster care. Here, the alternative was not foster care, but placement with the father. The mother was extremely uncooperative, refusing to participate in any services at all for months and refusing to speak to SSA without recording the conversations. She would communicate only through writing and her attorney.

This was not a case about a single incident, but about repeated and prolonged conduct with regards to N.V.'s care and mental health. The mother's participation with an extremely friendly "Creative Arts Therapist" was far from sufficient to ensure the child's safety. Simply engaging in services is not enough. (*In re V.L.* (2020) 54 Cal.App.5th 147, 157.) Her denial of her own conduct increased the risk of recurrence. (*Id.* at p. 156.)

21

At the disposition hearing, the mother described some "issues" other than those relating to the Seroquel dose in the hospital had been "miscategorized or misunderstood." Her continued denial of the reasons that had led to dependency, justification for her behavior, and inadequate treatment created the obvious concern of repeated conduct if the child were returned to her care. Accordingly, the court had ample evidence from which to find that no reasonable alternative to removal existed.

The mother argues that "any small doubt" about whether N.V. should have been placed with her "should have been resolved in favor of family preservation." (Boldfacing omitted.) Ignoring for the moment that N.V. is in the custody of his father, we find this argument without merit. No reasonable person looking at the evidence the court considered in this case would find that any doubt existed as to whether the child should be in her custody or the father's.

*Exit Orders*

The mother further claims the exit orders granting sole custody to the father were not in N.V.'s best interests. We review the decision to terminate jurisdiction and issue exit orders for abuse of discretion. (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300-301.) The exit orders must be in the child's best interest. (*In re Chantal S.* (1996) 13 Cal.4th 196, 201, 206.)

We need not repeat the reasons that the mother was properly relieved of custody, and therefore, shall not address her claim that she was "more than capable" of managing N.V.'s welfare and acting in his best interests.

The mother's primary claim is that the father repeatedly violated court orders during the pendency of this case. She points to the fact that the father's case plan directed him to complete a parenting class. The father testified that because by the time

22

he returned to New York with N.V., the COVID-19 pandemic prevented him from finding an available class. He informed SSA of this. Instead of going to a class, the father addressed parenting and parenting skills in his individual counseling. He was also in regular contact with N.V.'s therapist, who was helping him handle issues as they arose. She neglects mention of these facts and accuses the father of "[k]nowingly failing" to complete the parenting program.

The mother's selective use of the facts is disturbing. Her conclusion that the court's decision to accept the alternate parenting education provided by the father and N.V.'s therapists is an abuse of discretion is wrong. The evidence demonstrated that N.V. was "thriving" in his father's care by the time of the disposition hearing, and his behavioral improvements had been "marked and notable." The court's decision to excuse an in-person parenting class in the midst of a global pandemic, given the alternative education and the positive change in the child, was not an abuse of discretion.

The mother next argues issues related to in-person visitation and the father's dissemination of the Evidence Code section 730 evaluation to the visitation center as reasons why granting the father custody is not in N.V.'s best interests. While it is true that the father should not have disclosed the Evidence Code section 730 evaluation, she does not explain how this places N.V. at risk.

With respect to in-person visits, the father took N.V. to his first visit with the mother at the chosen visitation center at the end of October, but refused to return thereafter. The father had repeatedly expressed safety concerns to SSA because of her past conduct. The facility the father wanted to use was not available for new referrals. She claims, in conclusory fashion, that this was not in N.V.'s best interests, but does not explain how it puts his health or safety at risk. Given the court's finding that she was not an appropriate placement and coparenting was not an option, we are not certain what she

23

argues here as an alternative. In any event, the court's implied finding that the father was acting in good faith, and not willfully denying visits to her, was not an abuse of discretion.

The mother also complains that the father allowed supervised contact between N.V. and the father's nephew. She had previously accused the nephew of sexual abuse, which had been determined to be unfounded. The court's decision that this was not a concern was not an abuse of discretion.

The mother claims there was a "repeated disregard and knowing violation of court orders," and therefore, the father placed his own interests before N.V.'s. The proof, however, is in the pudding. There was ample evidence that the father was providing more than adequately for N.V.'s, physical, mental, and educational needs, and that the results had been excellent. Moreover, the mother seems to think a finding that the court abused its discretion here would mandate a return of N.V. to her. She is wrong. Were the court to find that the father was an unsuitable placement, the alternative would be placing N.V. somewhere else altogether, perhaps with another relative or in foster care. In any event, we find the facts she raises here are minor in terms of N.V.'s overall welfare, and accordingly, there was no abuse of discretion.

*Visitation and Counseling Orders*

The mother next argues the court improperly delegated its power regarding visitation and failed to enforce the visitation orders. SSA responds there is no effective remedy for any violation of past visitation orders at this point. In response, she claims her alleged denial of "visitation permeated the entire proceeding."

We disagree. Aside from the challenges created by a global pandemic and the difficulties inherent for SSA in trying to facilitate in-person visits across the country,

24

the court was faced with significant troubling evidence. The court did not question the bond between the mother and N.V., nor was it the basis for the court's determination that N.V. could not be returned to her. The court's decision which was based on her own insufficient progress to ameliorate the reasons that led to dependency. Even if she had in-person visitation with N.V. every day, nothing would have changed. She claims that the lack of visits prevented her from demonstrating "the skills and tools acquired in her case plan." But her conduct during visits (which were not entirely problem-free) was not the primary reason N.V. could not be returned to her. Rather, as set forth above, it was her persistent denials that she had done anything wrong and her decision to engage only with a therapist who never questioned her version of events that required the court to find N.V. could not be returned to her care.

Further, the court did not give N.V. the right to "veto visitation," as the mother claims, but issued visitation orders which SSA tried its best to implement, as thoroughly documented in the record. The primary case cited by her on this point, *In re S.H.* (2003) 111 Cal.App.4th 310, presented very different facts. The visitation order in that case did not set out parameters for visitation with any specificity, and stated "'if the children refuse a visit, then they shall not be forced to have a visit.'" (*Id.* at pp. 316, 318, fn. omitted.)

Unlike *In re S.H.,* here, we find the court entered appropriate orders as to visitation and gave SSA the flexibility to manage the process. The child was consistently made available for video conference visits. When N.V. refused to speak to the mother, SSA scheduled another visit, thereby providing "some assurance that . . . another visit will . . . actually take place." (*In re S.H.*, *supra*, 111 Cal.App.4th at p. 319.) N.V. was not consulted before visits were scheduled, and he was consistently encouraged to participate. She does not offer a solution to N.V.'s recalcitrance – should the father,

N.V.'s caregiver, have forced the child to sit in a chair and look at the screen against his will? As the court in *In re S.H.* noted, "the possible adverse consequences if a visit is forced against the child's will are factors to be considered in administering visitation." (*Id.* at p. 317.) Given her conduct at several visits and the impact that conduct had on N.V. – including the incident where she shouted to N.V., telling him to "'run because they are going to get him'" and "'they are not on your side,'" as well as her comments about "'aliens,'" there was reasonable concern about the effect of the visits on N.V. Given these facts, the court did not err by failing to force N.V. to participate in visits, nor did the court impermissibly delegate visitation issues.

We also find no abuse of discretion with regard to the court's order that N.V.'s therapist should determine when he was ready to begin conjoint counseling. The primary case she cites, *In re Donnovan J.* (1997) 58 Cal.App.4th 1474, is inapposite as it dealt with visitation, not counseling. "Unlike visitation, there is no statutory right to counseling. Counseling is merely a service the court may order if the court thinks it would benefit the parent and the child. [Citation.] A court may properly decline to order conjoint counseling if the child's therapist believes the child is not ready for it." (*In re F.P.* (2021) 61 Cal.App.5th 966, 975.) Accordingly, we find no abuse of discretion.

SSA is also correct in arguing that there is no effective remedy for purported violation of the visitation orders at this point, or the order regarding conjoint counseling – we can grant no possible relief because jurisdiction has been terminated. (*In re N.S.* (2016) 245 Cal.App.4th 53.) The only possible challenge is to the exit orders themselves, and as we set forth above, we find no abuse of discretion.

26

III

DISPOSITION

The juvenile court's orders are affirmed.


MOORE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


ZELON, J.*


*Retired Justice of the Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.